REINING *et al.* v. NEW YORK, L. & W. RY. CO.

*(Superior Court of Buffalo, General Term.* February 2, 1891.)

CHANGE IN GRADE OF STREET—RAILROAD EMBANKMENT—ABUTTERS.

Defendant railroad company, having obtained leave from the city council, pursuant to Buffalo city charter, (Laws N. Y. 1870, c. 519,) tit. 3, § 19, to lay its tracks in W. street, the fee of which was in the city, built an embankment 24 feet wide, and 6 feet high at its highest point, and running down to the grade of the street 359 feet from the point of beginning, with a perpendicular retaining wall on each side. The embankment was about 5 feet high in front of plaintiffs' premises, and 9 feet from the curb on that side of the street. A double track was laid on it, leaving a space 4 feet wide on one side of the tracks and 5 feet wide on the other. It was paved, but teams could not be driven on it, except along the tracks laid thereon, and plaintiffs could not go on it from their premises, except by going east to C. street, where an approach of gradual elevation had been made, or by going west to where the embankment reached the grade of W. street. No proceedings were taken to change the grade of W. street, as prescribed by title 9, § 8, of the city charter, such as obtaining the consent of the abutting owners, or giving them notice, etc. *Held*, that the embankment was not a change in the grade of the street, but was such a permanent and exclusive appropriation of a portion thereof as would authorize plaintiffs to maintain an action for damages. HATCH, J., dissenting.

Appeal from trial term.

Action by John Reining and others against the New York, Lackawanna & Western Railway Company for damages. Verdict and judgment for plaintiffs. Defendant appeals. For former report see 7 N. Y. Supp. 516.

Argued before BECKWITH, C. J., and HATCH, J.

*John G. Milburn,* for appellant. *David F. Day* and *Leroy Parker*, for respondents.

BECKWITH, C. J. The respondents own a building and a lot of land situated on the northerly side of Water street in the city of Buffalo; and they complain that the appellant, in constructing its railroad through Water street, under a permit of the common council, erected a stone wall between five and

six feet high and an embankment of the same height in the street and across
the front of the respondents' premises, and thereby took the possession and
occupancy of the respondents' easement in the street, or some portion thereof,
to the absolute and permanent exclusion of the respondents.   The appellant
contends that it has not taken any property or interest in property belonging
to the respondents, but that it built its railroad in the street with the consent
of the city, given by a resolution of the common council; and that the wall
and embankment were occasioned by a change in grade in the street, made
necessary in order to carry the railroad at a proper height over Commercial
slip, a water-way, and part of the Erie canal; and that consequently the wall
and embankment were not an unlawful exclusion of the respondents from the
enjoyment of their easement.   The territory of the state of New York, except
in limited, unsettled districts, is crossed by innumerable roads and highways,
which are established or preserved by an exercise of the legislative power for
the public use and public benefit.   They are among the most important of the
institutions belonging to modern civilization.   Without them society could
not exist.   In England they were for the common use of all the king's sub-
jects; and in this country, where the people are sovereign, all the inhabitants
have an equal or the like right to the advantages of travel afforded by them.
Every man has the right, rather than a privilege, of traveling over them.
It is what I will call a "personal civil right," belonging to his personal liber-
ties as a citizen or inhabitant of the state.   It is a right annexed to his per-
son, and does not give him the least property interest in the highway, nor in
the ground under the highway, nor in the air above it.   These highways are
established and altered, and possibly may be discontinued, by the legislature
in the exercise of the power and discretion derived from the people.   The
power of the legislature to alter and discontinue roads and streets ought to be
exercised for the public good,—the greatest good to the greatest number.   The
personal right of the citizen spoken of is the right simply to use the highways
that at any time are found within the state.   This personal civil right, which
belongs to him as one of the inhabitants of the state, exists the same whether
he owns or does not own lands adjoining a highway.   So far as that right goes,
the legislature, directly or by delegation, may change the highways, and alter
their grades, as the public good requires, without legal injury to any man,
even though he be the owner of land abutting on a highway the grade of which
is changed; and, so far as such personal liberty or right is concerned, it may so
change the grade that an adjoining individual lot-owner may be cut off from all
opportunity for direct entry upon the highway.   And such an alteration of
the grade of a street or highway may so far be held lawful, without a resort to
the legal fiction that at the original taking of the land for highway purposes
compensation was made which covered by contemplation all possible changes
of grade, which in a thousand instances is not the fact, but upon the princi-
ple which lies at the bottom of most of the political ordinances of this coun-
try,—that the convenience of the few must give way to the wants of the
many.   But the whole theory of the legality of measures which impose bur-
dens and losses upon individuals is that they are in fact so imposed, in the
judgment of the legislature, for the public good, and not the specific good of
other individuals, or specified persons, natural or corporate.

But, in addition to the personal right spoken of as belonging to an indi-
vidual as a citizen or an inhabitant of the state,—that is, the right of free
locomotion on the public roads,—the owner of a lot of land abutting on a high-
way or public street has another peculiar right connected with his ownership
of the lot of land and connected with the highway, which is a proprietary
right.   It has been recognized by the courts of this state and several other
states of the Union, by the legislatures of many of them, and by the courts
of England.   It was determined in the *Story Case,* 90 N. Y. 122, to be a pro-
prietary right, an easement in the street or highway attached to the estate or

ownership of the abutting lot of land or to the land. It is held to be property which cannot be appropriated to the use of the public without compensation. The right attaches to every parcel of land in the state which abuts on a highway; and every man in the state is concerned, as owner, tenant, or occupant, in the preservation of the right. The principle of the right is as general and extensive, and as much entitled to state regard, as the aggregate of the personal rights of the inhabitants to travel on the public roads, called the "rights of the public." Generally speaking, all the movements of people upon the public roads end in adjacent pieces of land as termini. Roads have a connection with the safety of the state, but are created mainly for the better business and social communication of the occupants of the contiguous soil. The rights of the public in the highways are said to be superior to the rights of individuals as abutting owners, but in the quality of their importance they are not superior. But the peculiar right of the lot-owner is something different from the mere right to go out from his premises upon the street and return from the street to his premises, for those are things which he may do by virtue of and in the exercise of that civil right which he holds in common with all the inhabitants of the state. What, then, is the quality, and what are the dimensions, of that peculiar proprietary right which belongs to him by virtue of his ownership of the abutting lot of land? It would seem to be something given from necessity or justice for the sake of the continual beneficial enjoyment of his estate. The beneficial use of his property—which is the thing of value for which a man pays a consideration when he buys a parcel of land—extends within the lines of the highway, and embraces, as was well settled by the *Story Case*, the light and air of heaven, and that other something which has been called "access." As remarked, that easement of access cannot be the mere right of going out from his home or place of business upon the street and returning therefrom upon his own land, which he may do by virtue of his personal liberty. But does not "the right of access" mean a certain convenience in the use of his property with respect to the rest of the world? If the land-owner is a trader, an hotel-keeper, a manufacturer, is not his easement somewhat commensurate with the uses to which his property is devoted? "An abutting owner necessarily enjoys certain advantages from the existence of an open street adjoining his property which belong to him by reason of its location and are not enjoyed by the general public, such as the right of free access to his premises, and the free admission and circulation of light and air to and through his property." *Lahr* v. *Railroad Co.*, 104 N. Y. 291, 10 N. E. Rep. 528. Public roads are created for the business and social reciprocity of all those whose dwellings and establishments everywhere border upon them. The easement or right of access would seem to include the opportunity for a man's customers to come to his place of business without unreasonable hindrance or interruption. A property devoted to business is of little value when business is turned away by obstructions and barriers. In cities, especially, buildings as places of business are erected on the marginal line of the street. I suppose that is lawful. The customs of the age sanction such construction, and consequently sanction the reasonable use of some portion of the street in front of the premises, and sometimes perhaps beyond, (*Collieries Co.* v. *Gibb*, 5 Ch. Div. 713,) for business transactions. Express wagons may drive up, and stand a reasonable time to unload or receive merchandise. Coaches and carriages may stop there to set down or take up passengers. *Callanan* v. *Gilman*, 107 N. Y. 360, 14 N. E. Rep. 264. Friends and customers may go into and out from his house without hindrance, except so far as they may be delayed by the legitimate public use of the street. The owner may stand his teams and wagons in the street in proximity with his land a reasonable length of time, in a reasonable manner, and, as I take it, may occupy a portion of the street, reasonably, convenient for his purposes. And I take it to be a general rule that this access is broad enough for

the beneficial enjoyment of his property; that, if his place of business is situated so as to invite trade and custom from the opposite side of the street, or from places on the street beyond in either direction, such patronage ought not to be turned away from him by obstructions put upon his front. This view of the nature of an abutting owner's easement in the street, or his right of access, seems to be supported by a number of English cases. *Fritz* v. *Hobson*, 14 Ch. Div. 542; *Lyon* v. *Fishmongers' Co.*, L. R. 1 App. Cas. 622; *Collieries Co.* v. *Gibb, supra.* The various privileges which may be exercised, and the various things which may be done, in a public highway by virtue of a lot-owner's easement are often spoken of as though performed under the authority of the public right, that is, the same right which every man enjoys when he walks or drives on a public thoroughfare. And so in some cases the question whether an abutting land-owner has sustained actionable damage from something done in the street has been made to depend on the inquiry whether that right which is held in common with all the people of the state —the public right—has been infringed. But the law under which that right is exercised is the law of motion, and would not suffer things to be done by a mere traveler upon the street, without reference to adjoining premises, which might lawfully be done in connection with the easements. Whatever the correct *rationale* of the abutting owner's right of action may be, it seems to be established that he has an easement in the public street which is property, and which cannot be taken, even for public use, without compensation. That there is a distinct easement connected with the ownership of land fronting on a street is recognized by numerous American as well as English cases. *Branahan* v. *Hotel Co.*, 38 Ohio St. 333; *Story* v. *Railroad Co.*, 90 N. Y. 122; *Lamm* v. *Railway Co.*, 47 N. W. Rep. 455.

While it is true that the courts hold on to the ancient common-law rules of somewhat arbitrary character, when the king, the state, the government, or whatever other name may be given to that image of the people's power, was of more importance than all the individuals who make up the people, and to the doctrine that the power of the legislature is so unlimited that it may change the established grade of streets and highways without the least regard to the circumstances of abutting owners, or the amount of damage that may be done to them as individuals for the public benefit, they nevertheless generally recognize the natural justice there is, in proper cases, of making a suitable compensation. "There are undoubtedly many cases where serious damages are done to abutting owners upon a street by altering the grade thereof; and the legislature, having regard for private rights, should generally make some kind of adequate provision to compensate such persons, specifying and regulating the mode of estimating and paying their damages; and it is believed that such provisions are contained in many of the city charters." *Ottenot* v. *Railway Co.*, 23 N. E. Rep. 169; *Rhodes* v. *Cleveland*, 10 Ohio, 159; *Hooker* v. *Northampton*, 15 Conn. 319. It was said by PECKHAM, J., in *Forbes Case*, 24 N. E. Rep. 919: "Assuming that the plaintiff had no title whatever to the land in the street through which the defendant laid its rails and ran its trains under legislative and municipal authority, I think it clear that, prior to the decision of this court in the *Story Case*, 90 N. Y. 122, he had no cause of action against the defendant based upon any illegal taking of the plaintiff's property or easement by defendant." Without denying that it is the law that an ordinary change of the grade of a highway may be made, when demanded by the public interests, without occasioning legal damage to abutting owners, yet it seems to be true that legislatures and courts everywhere recognize the justice of making compensation when abutting owners are specially damaged in excess of the inconvenience sustained by lot-owners generally. There are cases now and then of special damage, where the propriety of compensation appeals to every man's sense of justice. What reason is there for seeking to broaden the application of the common-law rule respecting the king's highway, so as to pre-

vent, in cases of special injury, the doing of plain justice to abutting lot-owners? When the question is whether a thing done for the public benefit is a violation of a private right of property, whether a construction is an occupancy of a private easement to the exclusion of the owner, what reason is there for securing public exemption by an arbitrary and unreasonable application of a maxim of the common law? Whether a thing done is an occupancy of private property to the exclusion of the owner, or only the exercise of a public power, depends often on an interpretation of the fact, its consequences, and its relation to the general purposes for which a power has been exerted in the public interests, and its relation to private interests. If the fact is essentially a private injury, and would be a legal injury unless it were a necessary consequence of the exertion of a power for the public benefit, it may be inquired whether the fact has an essential relation to the public object. *Cogswell* v. *Railroad Co.*, 103 N. Y. 21, 8 N. E. Rep. 537. As in the *Story Case*, in one respect, the posts set in the street to uphold the defendant's railroad structure were regarded as within the public use; and, in another view, as a dispossession of the plaintiff from his easement. The irresponsible power of the state government which enables it to alter highways and change their established grades is a power which relates to the public easement, the right of the inhabitants of the state generally, and should not be expanded in theory so as to be made a cover for taking private property without compensation.

The question remains whether or not the erection of the embankment in Water street, mentioned in the complaint, was simply a lawful change of the grade of a street, which consequently gives no cause of action in favor of an abutting owner whose easement has been destroyed or abridged. The plaintiffs' premises are situated on the northerly side of Water street, in which the defendant's railroad is constructed. The premises are bounded on the easterly side by Commercial street, on the west by Maiden lane, and on the southerly side by Water street. Occupying the whole lot up to the line of the street is a four-story brick building, which is used as a store and residence. Commercial street extends southerly across Water street, and terminates, a little beyond, in Buffalo harbor. Water street, before the embankment was made, was 66 feet wide. The embankment is 24 feet wide, and at the line of Commercial street is 5 feet 9 inches high, and extends westward, by a gradual descent, past the plaintiffs' premises, and across Maiden lane, and touches the original level of the street, 300 feet west of the plaintiffs' property. The embankment is supported laterally by solid, perpendicular stone walls, which extend across the front of the plaintiffs' premises, and across the entrance of Maiden lane. The embankment cuts off the original passage from the plaintiff's property through Commercial street to the harbor, although a graded approach, constructed by the defendant in Commercial street, makes a way over the embankment in Water street. Between the perpendicular stone wall on the northerly side of the embankment and the sidewalk in front of the plaintiffs' building is a space only $8\frac{1}{2}$ to 9 feet wide, which is the only carriage-way left on the Water-street side of the plaintiffs' premises. By the charter of Buffalo the sidewalk is to be used only by persons on foot. The railroad embankment is 24 feet wide on top, and the defendant's railroad tracks are laid upon its surface. The resolution of the common council gave the defendant permission to lay a double-track road. It is palpably plain that by the embankment the easement,—the access, which the plaintiffs formerly enjoyed in connection with their abutting premises—has been substantially taken away from them. The wagon-way left is not wide enough to allow two teams, meeting, to pass each other. It does not admit of the plaintiffs' using the street for the delivery of fuel or merchandise without interrupting the public travel on the street, subject to which their easement is held. The space is insufficient for the convenient standing of wagons, or the loading or unloading of goods. The embankment cuts off patronage from the street in front of the plaintiffs'

premises. It is a deprivation in a large degree of the substantial benefits of access from Water street. Their property interest in the street is almost wholly taken away from them. It is claimed by the defendant, nevertheless, that the plaintiffs are not entitled to compensation, because the deprivation of property which they have sustained has resulted incidentally from a lawful exercise of the legislative power of the state, causing a change in the street for the public benefit. It is asserted also that recent decisions of the court of appeals have settled the claims of the parties in favor of the defendant. It does not appear to us that those decisions necessarily dispose of this case, for several reasons. We do not think the decisions referred to are to be understood as overruling the *Story Case.* It would seem from what appears in the *Ottenot Case,* as reported, and the briefs used on the argument, that it was assumed or conceded, rather than decided, that there was a legal change of the grade of Water street when the defendant's tracks were laid, and that consequently the provisions of the charter of Buffalo, giving an abutting owner a remedy by an application to the common council for any damages sustained from a change of grade, was the plaintiff's only remedy. Section 2 of title 9 of the charter (Laws 1870, c. 519) requires that the grade of a street shall be established and described, and that the description of such grade, and all alterations thereof, shall be recorded, and that "no street shall be worked until the grade thereof is established and recorded." Those provisions contemplate the establishment, whether originally or by alteration, of a legal grade, for the benefit of the public, by an adjudication of the common council as to the requirements of the public convenience. Sections 7 and 9 of the same title of the charter provide for the grading of streets in the sense of working them. Then section 17 provides that when the city shall alter the recorded grade of any street the owner of a lot fronting thereon may within one year claim damages for such alteration by presenting his claim to the common council. I think the charter limitation applies only where the grade has been established or changed by the common council by a formal determination. The legislative power over highways is supposed to be exercised for the public good. It is a consistent check on the delegated power of the common council that, before the grade of a street shall be actually altered, the common council shall first formally determine and describe the new grade. Where private rights are to be affected, the power should be exercised within its strict limitations. I do not think the provisions of the charter providing a remedy were intended to apply to every change in a section of a street or in a portion of the soil, even if made under some resolution of the council, nor to changes which are incidental to the performance of some other public work. The actual surface of a street often remains for a long time unconformed to the established grade. Erecting an embankment in a street does not itself alter the legal grade. A provision of the charter empowers the common council to give a permit to railroad companies to lay their tracks in, along, and across the streets of the city. It seems to me that that means the surface of the streets as they exist. But if the power to allow railroad tracks to be laid in the streets carries with it the incidental power to impose conditions as to the crossing of other streets, the height of bridges and their approaches, and the tracks are laid, the conditions should be deemed to be accepted as such, with the legal liabilities incident to the construction of a track in conformity to them. Such a permit would be a protection to the company for any supposed interference with the public easement, but would leave private rights of property untouched.

Upon the authorities, the laying of a railroad track upon the surface of a street violates neither the public easement, nor the rights of abutting owners; and the laying of a track subject to the provisos supposed would not necessarily subject the company to liability for damage to individuals. But to call a bridge, a trestle, an embankment constructed under such a permit a "change of grade," where no change of grade has been officially determined, seems to be

both fallacious and unjust, although it is, like much of the legal reasoning, founded on the postulates of the common law, by which immunity is given for the violation of private rights and the destruction of private property. In this case the common council passed a resolution purporting to allow the defendant to build an embankment in Water street, such as its engineers might deem practical to carry its track over the canal, according to a plan of its own, and subject in some degree to the approval of the city engineer. The gradient of the embankment westward from Commercial street across the front of the plaintiffs' premises and beyond was not definitely fixed, nor was it established and recorded. The embankment in Water street was allowed by the common council, and was constructed, in fact, as a bed for the defendant's tracks. It is true that the surface was required to be paved, and is called a portion of the street, but it cannot be said that the embankment was made for the improvement of the street as a public thoroughfare. The retaining walls were put in the street for the purpose of holding up the bed of the railroad, and for no other purpose; and those walls occupy portions of the street as permanently and exclusively as they would if earth had not been filled in between them. They are as effectually obstructions in the street for the benefit of the defendant in its private character as a business corporation as the posts set under the elevated railroad in New York. The walls are there, dispossessing the plaintiffs from their easement. They abridge and take away the lawful access connected with the plaintiffs' land; and, although the plaintiffs might, by going a roundabout course, become travelers on the highway, and, in the exercise of that right which they hold in common with other members of the community, might drive up and down the embankment, yet they could not therefrom use their easement,—could not have access to their premises. The fact remains that the walls are an absolute, permanent, and exclusive occupancy of a portion of the proprietary interest of the plaintiffs. The fact that the general public may travel on the embankment does not alter the fact that the walls erected by the defendant in the street are a deprivation of the plaintiffs' rights of property therein, for their easement consists in the facilities afforded by the street in front of their premises, it has been said, to its whole width, for the useful, profitable, and pleasurable enjoyment of their adjacent property. If the elevated road in New York had been planked on top, so as to accommodate persons on foot, the posts below would not have been any less the obstructions in the street that they were held to be. It was right to allow the railroad tracks to be laid in the street, but it is not right to deprive the plaintiffs of their property by a legal fiction, nor by a strained interpretation of the fact, so as to make that a mere consequence of a lawful change of grade, which more rationally and more justly is a taking of private property for public, if not private, use. When the thing done is equally susceptible of being regarded as the mere incidental result of the exercise of a lawful power for the public benefit, and as being an unlawful taking of private property, justice requires the construction that will give protection to private property; for why should an individual give up his property for the benefit of the public without compensation? In another view the embankment is little more than an elevated railroad track over the canal. The defendant was permitted by the common council to lay a double track along the embankment. It is possible to drive teams that are accustomed to the cars along the embankment, when not occupied by trains, but an embankment only 24 feet wide, with double tracks upon it, is not a place that answers the legal requirements made of the city by its charter to keep its streets in a safe condition for travel. The ordinary traveler, driving upon the embankment, who should receive an injury from the fright of his horse and from the cars, could hardly maintain an action, or save himself from nonsuit for contributory negligence; for a man may not put himself in a place of danger simply because he has a technical right of way. For further considerations of

this aspect of the case, I will refer to the opinion of Titus, J., in *Jeaume* v. *Railway Co.*, *post*, 249, (decided at this term.)   In my opinion, the judgment appealed from should be affirmed.

Titus, J., did not sit.

Hatch, J., (*dissenting.*)   Plaintiffs are owners of property fronting on Water street, and by this action seek to recover damages for the appropriation of the street to railroad uses.   The facts are brief, and have been before the court under varying circumstances and cases many times.   The fee of Water street was acquired by the city of Buffalo by proceedings *in invitum* under and by virtue of title 8 of chapter 519, Laws 1870.   In 1882 the defendant made application to the common council of said city for leave to construct and operate its railroad through several streets therein.   The council granted such permission, pursuant to a resolution, which, so far as material here, is as follows: "That permission be and hereby is granted to the New York, Lackawanna, and Western Railway Company to lay and maintain two railroad tracks from the easterly line of the city of Buffalo, northerly of William street, and where the route of said road, as laid down upon the map thereof filed in the office of the clerk of the county of Erie, crosses such city line to the points hereinafter mentioned, and to cross with such tracks, * * * upon the line and at the grades specified upon the map and profile of the route of such company filed in the office of the clerk of Erie county, May 19, 1881, and thence proceeding westerly * * * across Main street, and through the block to Prime street; thence along the northerly line of Prime street, but so that no part of the track shall be in Prime street; thence across Lloyd street, at a grade not to exceed five feet above established grade of street, and construct crossings of a grade not to exceed three feet to the 100 feet, under the direction of the engineer; thence to and into and along the center of Water street to the docks of the Delaware, Lackawanna, and Western Railroad Company, at the foot of Erie street.   Said company is further authorized to cross at grade * * * Maiden lane on the line between Commercial and Erie streets, as laid down upon the map so filed in Erie county clerk's office."   This grant was made subject to the following conditions, among others:   "*Second*. That whenever said tracks cross at grade and are laid within a street, such company shall cause the space between its exterior rails to be paved or planked, and shall cause such pavement or planking to be kept in repair.   *Third*. That such tracks, westerly of the junction of Ohio and Elk streets, shall be so laid that the top of the rail shall be flush with the pavement, so as not to obstruct travel in such streets."   That portion of the road lying westerly of the junction of Ohio and Elk streets includes Water street.   Under and by virtue of this resolution and its charter, granted by the state, defendant proceeded to construct its road.   At a point west of Lloyd street it was necessary to cross Commercial slip, a part of the Erie canal.   The elevation at which it should cross was fixed by the state authorities pursuant to law, (chapter 276, Laws 1834, § 17,) in accordance with which the height was fixed at 14 feet above the water level.   This necessitated a change of grade and a rise in the streets, each side of the bridge, and resulted, in Water street, in the railroad starting at a grade west of the slip, and gradually rising until it crosses the slip.   The structure which thus changed the grade is built of solid walls of masonry on either side, with filling between, upon which the rails are laid; and the whole surface is paved. Its length in Water street is 300 feet; its width, 24 feet; and its greatest height, 5 feet and 9 inches.   It is not contended but that this raised structure is made necessary in order to cross Commercial slip at the established height fixed by the state; but it is insisted that defendant acquired no rights whatever to erect the structure or change the grade in Water street, either by

grant of the council or otherwise; that all authorization to lay tracks or operate a road west of Main street was stricken from the prevailing resolution. The record discloses, by inference, that the subject-matter had previously been before the council, and that it had been the subject of consideration by the committee on streets. When the matter was taken up by the council a substitute resolution was offered for the report of the committee on streets, and forms the basis of authority acted upon by defendant.

The particular thing relied on by plaintiff relates to a resolution offered, which provided that all of the prevailing resolution relating to that portion of the route west of Main street should be stricken out, as the same had previously been adopted. This amendment was adopted, but was immediately reconsidered, and then left without further action, so that it found no place in the resolution as finally passed. Subsequently a resolution was passed, which fixed the grade across Lloyd street. Numerous other amendments were offered, some of which were adopted and some rejected, but none affecting the particular matter here, except those stated. The resolution was then adopted, and, so far as material now, is the one quoted. It is seen from this that the reference to the construction of the road lying west of Main street, so far from being stricken out, remained; that the grade was established at the crossing of Lloyd street, where it approached Commercial slip, at five feet, thus modifying the original substitute for the report of the committee, which had provided that the grade should be such as was necessary, in practical construction, to meet the grade fixed by the state engineer at the crossing of the slip. It is true that no mention of the grade in Water street is made, in words, in the resolution; but it authorizes its construction there in accordance with a certain profile and map, which showed the grade, then on file; and, according to the testimony, the grade now there is in accordance with such profile and map. If, however, there was this absence, the resolution having provided for the crossing of the bridge into Water street, and the construction of the road therein, it will not be assumed that a valueless grant was made; and, as the road could not approach or leave the bridge except an approach be constructed for it, such construction, in the absence of statutes prohibiting it, will be presumed to exist as an essential incident to the grant. *Slatten* v. *Railroad Co.*, 29 Iowa, 148. The contention, therefore, that no grant was made, cannot be upheld. It is further insisted upon that, even though the construction of the road in Water street be authorized, yet that it is not constructed in accordance with the grant made. The particular defect insisted upon is that the resolution authorized the crossing of Maiden lane at grade, while it appears that at the east line of Maiden lane it is two feet above grade. It would be sufficient in answer to say that the record nowhere shows the point where the railroad starts to leave the grade, and whether east or west of Maiden lane. Doubtless the maps used and introduced in evidence upon the trial disclosed this fact, but they are not made a part of the present record. If it were otherwise, the testimony is to the effect that the road-way, as it now exists, is constructed in every respect with the profile and map on file; that it was inspected by the city engineer, and approved of by him. The resolution provides that the crossing shall be made at this point, at grade, as laid down upon the map filed; and it will not be assumed that inconsistent grants were made. As to the present grant and structure, the map and profile provide for it, and the city authorities have given a practical interpretation to the resolution, through its constituted authorities, that the present construction is in accordance with the grant. Claim is also made that the proceedings taken by the city to acquire the fee of Water street are void. It is not contended but that the legislature authorized the city to acquire the fee of the street; that the proceedings taken, in conformity with such act, are in all respects regular; and that they were confirmed by judgment of this court. Whatever may have been the reasons which induced the city to acquire the

fee, and however inadequate may have been the sums awarded for the property rights taken, we are confronted with the condition that a proceeding taken in conformity to law has resulted in a judgment which is in all respects conclusive in this action. *In re Ferris*, 10 N. Y. St. Rep. 480, affirmed at general term, MS. opinion SMITH, J., (not reported.)

The claim is further made that, if the proceedings referred to are in all respects regular, the council had no power to authorize the change of grade by the proceedings taken; that it is in no sense a change of grade, but an appropriation of the street. So far as the latter question is concerned, it will be hereafter noticed. By title 3, § 19, the council is authorized, by a vote of two-thirds of all its members elected, to permit the track of a railroad to be laid in, along, or across any street. The vote in the council by which the resolution awarding the grant was passed shows that the required number authorized it. This authorized the construction of the road in Water street, unless some prohibition exists. The latter is claimed, and we are referred to sections 2, 7, 8, tit. 9, charter of the city of Buffalo, for its support. The first of these sections provides for the establishment of the grade of a street, its description and alteration, which shall be recorded with the city clerk. The others provide for grading, and so forth, of streets, and the course of procedure in changing the grade, by which it appears that three-fourths of all the members elected must vote for the proposed change when the sum to be expended shall exceed $500, and there must also be notice of intention published three times a week for three weeks, or the regrading must have been applied for by a majority of resident owners whose lands front on the street, etc. The evident object and purpose of these sections is to give the land-owner an opportunity to be heard whenever any proceeding is taken which results in imposing a burden upon his property by way of taxation, and this is essential to meet a constitutional requirement. If the moving party is the city, through the common council, and the cost exceeds $500, then notice of intention must be published; if the owners are the movers, then no such notice is necessary to give the council jurisdiction, as the minority who do not petition are protected in the right to be heard at the time the tax is laid, for by section 10 of the charter the cost of such improvement is to be borne by local assessment, and other provisions provide for notice. It is quite evident to my mind that these sections have no connection with or application to the power vested in the council to authorize the use of streets for railroad purposes. The only limitation in the section granting the power is in the required two-thirds vote. The sections referred to as a limitation upon the power have application alone where the cost of the work is to be borne by local assessment and exceeds $500. When the right to use a street is vested in the railroad no burden of taxation upon the lands fronting thereon is authorized or contemplated; all cost and expense incident to the grant is borne by the company, so that, whether the cost of the work, imposed upon the company, is great or small, is not of the slightest consequence to the lot-owner, as he bears no share of it; and consequently the provisions passed to protect him in this regard fail for want of application to such a case. It is urged that the right is not limited to purposes of taxation, but embraces the right to be heard with respect to damages inflicted upon adjoining property as incidental to the change. It is to be noticed that the sections of the charter referred to are silent in this regard, and such construction must embrace something not expressed in words, and, I think, not intended. This view seems conclusive from the fact that by section 17 of the same title provision is made that the lot-owner, within one year after the improvement or change, may present his claim to the city, and have his damages assessed, and this without reference to the costs of the work. Thus a complete and harmonious system is established. *First*, the council has the right to order the change; *second*, if the costs of the work to be assessed upon the lot-

owners exceed $500, notice must be given, or petition made; *third,* if any lot-owner be damaged by the improvement, whether ordered by the council, with or without notice, or upon petition, such damage is to be measured upon application by the lot-owner. This system seems to protect the owner in any contingency, imposes no burden without a right of hearing, and, when damage results, provides a remedy. I see in all this no limitation upon the power of the council to make the grant and authorize the change. It is further said that before the grant becomes effectual the grade must be established and recorded. If this be so, I think the grade was sufficiently established in the resolution authorizing the construction, for the map and profile on file clearly showed it. If there has been failure to record, it cannot vitiate the action taken, for that was alone a clerical act, directory in its character, and can be complied with at any time. *People* v. *Haupt,* 104 N. Y. 377, 10 N. E. Rep. 871. What effect such omission may have, if any, upon the right to make application for damages, it is not now necessary to determine. The views herein expressed find support in *Ottenot* v. *Railway Co.,* 23 N. E. Rep. 169; *Conklin* v. *Railway Co.,* 102 N. Y. 107, 6 N. E. Rep. 663; *Briggs* v. *Railroad Co.,* 79 Me. 363, 10 Atl. Rep. 47; *Wolfe* v. *Railroad Co.,* 15 B. Mon. 404; *Slatten* v. *Railroad Co., supra.*

Finally it is claimed that there has been no change of grade of the street in any sense, but that there has been an utter destruction of the street, and a complete appropriation of it to railroad uses. The doctrine announced in *Story* v. *Railroad Co.,* 90 N. Y. 122, is cited and relied upon to support this contention. This case has recently been the subject of re-examination and limitation by the court of appeals. *Forbes* v. *Railroad Co.,* 24 N. E. Rep. 919. It is there held that the *Story Case* did not intend to nor did it overrule any principle of law which had previously existed, but that it simply made application of established principles of law to facts in a new combination. Judge PECK-HAM says: "Such facts amounting, as was determined, to an absolute and permanent obstruction in a portion of the public street, and in a total and exclusive use of such portion by the defendant, and such permanent obstruction and total and exclusive use, it was further held, amounted to a taking of some portion of the plaintiff's easement in the street for the purpose of furnishing light, air, and access to his adjoining lot." And again, referring to the property right taken, the learned judge says: "But this taking, it cannot be too frequently or strongly asserted, resulted from the absolute, exclusive, and permanent character of the appropriation of the street by the structure of the defendant." Referring to the rule applicable to surface steam railroads, the learned judge says: "For many years prior to the decision of the *Case of Story*  *  *  * I think the law was that a duly-incorporated railroad company, having authority from the state to build its road, and laying its tracks and operating its road through and upon the surface of the streets of a city under the protection of a license from such city, took thereby no portion of the property of an individual who owned land adjoining the street, but bounded by its exterior line. The company was, therefore, not liable to such an owner for any consequential damages to his adjoining property arising from a reasonable use of the street for railroad purposes, not exclusive in its nature and substantially upon the same grade as the street itself, and leaving the passage across and through the street free and unobstructed for the public use." This case, taken with the case of *Ottenot* v. *Railway Co., supra, Conklin* v. *Railway Co., supra,* and the *Story Case,* seem to settle the law of the present case. As applicable here, we find that this embankment is not an absolute and exclusive appropriation of the street. It still remains open upon each side for street purposes, as it always existed. There is no proof to show that the surface of the embankment is not passable for vehicles and the ordinary uses to which a street is put, or that the use by defendant has been unreasonable, or degenerated into a nuisance, or been ex

clusive, in any sense, beyond such as ordinarily attaches to the use of steam motive power on the surface of a street. On the contrary, the proof is that the rails are laid flush with the pavement of the street; that the surface is paved, as an ordinary street; that it is accessible from the point where it commences to rise above grade for the usual traffic of a street; that at its highest point approaches for foot passengers and teams have been built. These facts all rebut the contention that the use of the surface of the street is absolute and exclusive by the road. It is quite clear within the authorities that the damage suffered is such as is consequent upon the changed grade, and not such as arises from the absolute and exclusive use of the street by the railroad or its structure. It seems, therefore, to fall outside the *Story Case*, and allies itself to the principle announced in the *Forbes Case*. If these views are correct, it follows that the judgment appealed from must be reversed, and a new trial ordered, costs to abide event.